# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Sharon Martin, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) Case No. 20-CV-00415-RK |
| Jimmy John's, LLC, et al., | ) |
| Defendants. | ) |

## ORDER DIRECTING ATTORNEYS TO REFLECT

Before the Court is Plaintiffs' second request for a discovery dispute conference. This second discovery dispute conference is scheduled for 1:30 p.m. on August 18, 2021. After review of the parties' submissions to the Court setting forth the current dispute, and in conjunction with the proceedings in the first discovery dispute conference, the **August 18, 2021, conference is CANCELLED.** The Court further directs Counsel for Plaintiffs (Blake Evan Mattingly, David Curtis Nelson, Matthew Armstrong, Reza John Azimi-Tabrizi, and Stuart L. Cochran) and Counsel for Defendants (Nury H. Yoo, Robert S. Niemann, Sara Fevurly, and Michael S. Hargens) to **READ and REFLECT on the remarks by Justice Sandra Day O'Connor** given September 26, 1997, at the Washington University School of Law in St Louis, Missouri.

1. First Discovery Dispute

The first discovery dispute conference was held on July 15, 2021, and spanned approximately two hours. A sampling of the Court's comments from the 65-page transcript of the July 15th conference illuminates the Court's concerns with counsels' professionalism.

- "Tell me why we're at such a position now where it's a year and a half, and we're at a discovery dispute where there's so many issues that aren't moving forward well."
- "I've only been a judge for six years, and I've seen several of these type cases, just in this same profile, and some have had discovery disputes, but I haven't had …one like this … I think this one stands out a bit."
- "[W]e're a year out and we're starting at square one with some of the basic procedures that these cases, at least that come before me, are doing."
- "We've gone at this for two hours, and I think hopefully both sides can see that there is definitely better methods that both sides could utilize to move this forward. I'm not

> going to make any rulings. I'm going to have you all work together and try working through discovery."
> - "I'm not going to micromanage to this level. You need to follow the rules, have basic courtesy, and we'll let it go at that."

2. <u>Second Discovery Dispute</u>

On August 5, 2021, Counsel for Plaintiffs, David C. Nelson, complained in a discovery protocol email "Defendant has produced nothing since July 15, the date of the last hearing with the Court," and subsequently requested the scheduled August 18, 2021, discovery dispute conference. Attorney Nelson described the discovery dispute with one sentence: "Defendant has produced nothing since July 15, the date of the last hearing with the Court."

On August 16, 2021, Counsel for Defendants, Michael S. Hargens, responded "Plaintiff's statement that Defendants have not produced any documents since the last discovery conference is inaccurate. Last week, Defendants produced an additional 358 documents (which consisted of 856 pages)."

On August 17, 2021, Counsel for Plaintiffs, David C. Nelson, submitted to the Court a reply addressing one issue, that is, Defendant's response is "technically-true-but-completely-misleading."

As to the second discovery dispute conference, the Court has received no other submissions by counsel other than the August 5, August 16, and August 17 submissions noted above. These submissions reflect no cognizable discovery complaint outstanding before the Court.

3. <u>Professionalism</u>

Review of the parties' submissions regarding the discovery dispute raises the paramount issue of professionalism and civility. It is well-settled that "[b]y its nature as a court of justice, the district court possesses inherent powers 'to manage its affairs so as to achieve the orderly and expeditious disposition of cases.'" *Wescott Agri-Products, Inc. v. Sterling State Bank, Inc.,* 682 F.3d 1091, 1095 (8th Cir.2012) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-46 (1991) (citation omitted)). These powers include "the authority to police lawyer conduct and to guard and to promote civility and collegiality among the members of its bar." *Id.* at 1095-6 (citing *Sahyers v. Prugh, Holliday & Karatinos, P.L.,* 560 F.3d 1241, 1244 (11th Cir.2009)).

A lawyer's professional responsibilities include being a zealous advocate "while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system." ABA Model Rules of Professional Responsibility, Preamble at [8], [9]. Further, "[t]he lawyer's duty to act with reasonable diligence does not require the use of offensive tactics or preclude the treating of all persons involved in the legal process with courtesy and respect." ABA Model Rules of Professional Conduct, Comment on Rule 1.3 at [1].

Mr. Hargens argues in his August 16, 2021, submission to the Court, "Plaintiff's statement that Defendants have not produced any documents since the last discovery conference is inaccurate." The Court notes at the time Mr. Nelson made the statement on August 5, 2021, it appears Mr. Nelson's statement was in fact true. The Court finds the wording used by Mr. Hargens to be misleading. A fair wording would reflect Mr. Nelson's August 5, 2021, statement was "no longer accurate," or was "now inaccurate." This is especially significant in light of Defendant's "eleventh-hour" production of documents, after close of business, on Friday, August 13, 2021, in conjunction with Mr. Hargens' claim to the Court on Monday, August 16, 2021, of Mr. Nelson making inaccurate statements to the Court.

In Mr. Nelson's August 17, 2021, reply to the Court, Mr. Nelson would have been better served by simply stating his August 5, 2021, statement was true when written, and acknowledging that subsequently on Friday, August 13, 2021, Defendants produced 358 documents after close of business. Rather than maintaining grace under pressure, Mr. Nelson submitted the following reply: "Plaintiff's written statement of August 5 was indisputably true. Defendants know that . . . Defendants accuse me of misleading this Court, and come within a hair's breadth of calling me a liar. I do not take the attack on my reputation lightly." The Court finds Mr. Nelson's August 17, 2021, comments to be histrionic, unpersuasive, and uncalled-for.

The Court concurs with Justice O'Connor's comments that, "incivility disserves the client because it wastes time and energy – time that is billed to the client at hundreds of dollars an hour, and energy that is better spent working on the case [rather] than working over the opponent." "When the lawyers themselves generate conflict, rather than focusing on the dispute between the parties they represent, it distorts our adversarial system. More civility and greater professionalism

3

can only enhance the pleasure lawyers find in practice, increase the effectiveness of our system of justice, and improve the public's perception of lawyers."

Accordingly, the **August 18, 2021, conference is CANCELLED**, and each and every counsel of record in this case is directed to **READ and REFLECT on the remarks by Justice Sandra Day O'Connor** below.

**IT IS SO ORDERED.**

/s/ Roseann A. Ketchmark<br>ROSEANN A. KETCHMARK, JUDGE<br>UNITED STATES DISTRICT COURT

Dated: August 18, 2021

**Remarks by Justice Sandra Day O'Connor at the dedication of Anheuser-Busch Hall, Washington University School of Law, St Louis, Missouri, on September 26, 1997. (Source citations omitted)**

It is a great pleasure to be here at Washington University to dedicate this magnificent new home for the law school. Winston Churchill once said that "[w]e shape our buildings and afterwards our buildings shape us." Here you have shaped a beautiful site, commensurate with Washington University's reputation and equipped to meet the demands of contemporary legal education. I expect that this stunning facility will in turn inspire innovative scholarship, and nurture young lawyers with the finest legal skills and the highest professional standards.

As lovely as it is, what I would like to talk to you about today is not your new building. I would like to discuss my granddaughter. You see, I recently returned from an extended period of grandmother-granddaughter bonding - sort of a cross-generational in-the-family version of Thelma and Louise - and she is often on my mind. At one point during the visit, my granddaughter came to me, disappointed about having to perform some task or another. It was pointless, she said. Well, she didn't actually say '"pointless." Pointless, in the vocabulary of a young child, is replaced by two words: "But why?" Her meaning was clear nonetheless. Her second objection was that it was "no fun."

"Pointless and no fun," one of my friends quipped. "'If those were legitimate objections, we wouldn't have anyone practicing law." The comment seemed funny at that moment, but in

4

retrospect it seems disconcerting. Is that what the practice of law has become-pointless and no fun? It seems that, in the eyes of many lawyers, it has. More than half of all practitioners report dissatisfaction with the profession. According to one lawyer, the economic pressures of the legal marketplace have escalated workdays to a point where practice is "like drinking water from a firehose." In this climate, attending to any professional obligations beyond billable hours seems impossible. Nor is dissatisfaction limited to those within the legal community. In society at large - that is among those we would call "non-lawyers" - lawyers are compared frequently, and unfavorably I might add, with skunks, snakes, and sharks. Few Americans recall the trust that our society once placed in its lawyers; it hardly seems possible that Alexis de Tocqueville, were he to come to America today, would conclude that lawyers are our nation's "natural aristocracy."

Partially responsible for this decline, I suspect, is a decline in professionalism. Dean Roscoe Pound said that a profession is "a group ... pursuing a learned art as a common calling in the spirit of public service - no less a public service because it may incidentally be a means of livelihood." And, while my granddaughter undoubtedly is a far more interesting subject, what I really want to talk about today - for a few minutes - is the obligations of professionalism: obligations in dealings with other attorneys; obligations toward legal institutions; and obligations to the public whose interests lawyers must serve. Personal relationships lie at the heart of the work that lawyers do. Even in the face of the vast technological advances of the information age, the human dimension remains constant, and these professional obligations will endure.

It has been said that a nation and its laws are an expression of the highest ideals of its people. Unfortunately, the conduct of our nation's lawyers has sometimes been an expression of the lowest. Clients increasingly view lawyers as mere vendors of services, and law firms perceive themselves as businesses in a competitive marketplace. As the number of lawyers in this country approaches one million, the legal profession has narrowed its focus to the bottom line, to winning cases at all costs, and to making larger amounts of money. Almost every complaint about the decline of ethics and civility "sounds the dirge of the profession turning into a trade." Practice at the turn of the century, we are told, "promises to be nasty, brutish and, for some, short."

One lawyer who recently stopped practicing law explained his decision to leave the profession in these bleak terms: "I was tired of the deceit. I was tired of the chicanery. But most of all, I was tired of the misery my job caused other people. Many attorneys believe that zealously representing their clients means pushing all rules of ethics and decency to the limit." This

5

complaint is not unique. In a National Law Journal study, over fifty percent of the attorneys surveyed used the word "obnoxious" to describe their colleagues.

Indeed, sometimes attorney conduct crosses over from rude to downright scandalous. Two lawyers from prominent New York firms recently turned a deposition into an actual brawl. And attorneys have been spotted exchanging invectives and even engaging in shoving matches in front of various court clerks' offices, an image that recalls the description of modern-day litigation as ice hockey in business suits. A sitting federal judge, who may deserve a medal, became so exasperated with a pair of lawyers in a case before him that he wrote an order noting that both counsel had violated the local lawyers' creed of civil conduct. The order stated:

> This is an aspirational creed not subject to enforcement by this court, but violative conduct does call for judicial disapproval at least. If there is a hell to which disputatious, uncivil, vituperative lawyers go, let it be one in which the damned are eternally locked in discovery disputes with lawyers of equally repugnant attributes.

It is no wonder that one magazine has run an article entitled "Lawyers' Lot Not a Happy One."

Most of us probably never encounter such outrageous conduct. I would hope that it is not that often that lawyers encounter even ordinary discourtesy. But a Seventh Circuit study conducted in 1991 revealed that forty-two percent of lawyers, and forty-five percent of the judges, in that circuit think that civility is a profession-side problem. And the problem seems to be growing. In a 1996 survey of the D.C. Bar, sixty-nine percent of the lawyers polled identified civility as a problem. A recent survey of presidents of state and local bar associations produced an even more startling result: ninety percent of the respondents reported both problems with civility and diminished respect among lawyers in their jurisdictions. These statistics mean that lawyers far too often breach their professional obligations to other lawyers - that many lawyers are caught up in a system of behavior that is "structurally, morally, and emotionally exhausted." When the lawyers themselves generate conflict, rather than focusing on the dispute between the parties they represent, it distorts our adversarial system. More civility and greater professionalism can only enhance the pleasure lawyers find in practice, increase the effectiveness of our system of justice, and improve the public's perception of lawyers. We have lost sight of a fundamental attribute of our profession, one that Shakespeare described in The Taming of the Shrew. Adversaries in law,

he wrote, "[s]trive mightily, but eat and drink as friends." In contemporary practice, however we speak of our dealings with other lawyers as war - and too often we act accordingly.

But one need not envision litigation as war, argument as battle, or trial as siege. Argument, for example, can be thought of as discourse. I know that when I ask a question at oral argument, it is not meant as an attack; it is an invitation for counsel to address an area of particular concern to me. The most effective advocates respond accordingly, answering honestly and directly. Indeed, one good approach to oral advocacy is to pretend that each judge or justice really wants to vote your way - and will - but only if you can set the judge's concerns to rest by answering that question which the judge finds troubling.

Trial similarly can be envisioned as an investigation in which the jury must choose between competing versions of the facts. Ranting and raving in front of the jury probably does little to convince. A more persuasive technique is to present oneself as a reasonable person who wants to see justice done - it just so happens that justice is done by finding for your client, not opposing counsel's. All too often attorneys forget that the whisper can be more dramatic (and more compelling) than the scream. Justice Holmes, no slouch of an advocate, believed that "a lawyer [can] try [a] case like a gentleman" - or gentle woman, I would add – "without giving up any portion of his [or her] energy and force." Hemingway used the vernacular. "Guts," he told us, "is grace under pressure." Grace, however, is not a virtue many of today's lawyers choose to advertise, as underscored by one lawyer's characterization of his "marketing strategy": clients, he explained are "not looking for a guy who coaches Little League. They don't want a wimp. They want a lawyer who means business, an animal who's going to get the job done, whatever it takes." It is appalling that any member of our profession would describe himself in these terms. "Getting the job done" should go hand in hand with courtesy; a lawyer can "mean business" without remaking himself as an "animal."

The common objection to civility is that it will somehow diminish zealous advocacy for the client I see it differently. In my view, incivility disserves the client because it wastes time and energy - time that is billed to the client at hundreds of dollars an hour, and energy that is better spent working on the case than working over the opponent. According to an English proverb, "[t]he robes of lawyers are lined with the obstinacy of clients." In our experience, the obstinacy of one lawyer lines the pockets of another; and the escalating fees are matched by escalating tensions. I suspect that, if opposing lawyers were to calculate for their clients how much they

7

could save by foregoing what has been called "Rambo-style" litigation (in money and frustration), many clients, although not all, would pass in the pyrotechnics and happily pocket the difference. It is not always the case that the least contentious lawyer loses. It is enough for the ideas and positions of the parties to clash; the lawyers don't have to.

The bench and the bar have begun to address the issue of professionalism in lawyer-lawyer relations. Codes of ethics and professional conduct are good starting points and no doubt necessary. But they focus on what a lawyer should not do rather than teaching lawyers what they affirmatively ought to do. More recently, some jurisdictions have created so-called civility codes - unenforceable guidelines that articulate the basics of common courtesy.

Unfortunately, civility is hard to codify or legislate. Discourtesy is notoriously subjective - you know it when you see it - and assessing blame is somewhat akin to asking a pair of fighting fourth graders "who started it." More important, without a fundamental change in attorney conscience, even the best codification of civility can become, to extend the war metaphor still more, just another battleground. Lawyers simply take up the code of conduct and club each other with that, levying accusations of incivility and bringing motions for sanctions. One court has noted that complaints of this nature are "akin to static in a radio broadcast [that] tends to blot out legitimate argument."

In the end, it is by deed rather than by decree that attorneys teach each other that it is possible to "disagree without being disagreeable." The first place where young lawyers can learn to disagree agreeably is right here - in law school. Although there may be no remedy for the competitive nature of the law school experience, schools can do something about how that experience shapes a young lawyer's approach to practice. Good professors may employ the Socratic method, but not in the interest of disparaging students; rather, they should engage the students in a dialogue which, although sometimes painful, helps students explore the law and develop critical thinking skills. And outside of class, students can learn collegiality from an atmosphere in which each person is treated with respect and understanding. Of course, some schools are more successful in this respect than others: I am sure the Washington University School of Law can stand tall.

Many law schools have moved beyond acculturation and have begun to meet the issue of professional conduct head on. "Being a lawyer," one professor points out, involves handling the inherent tension among the demands "of a client, fulfilling one's own interests, being an officer of

the court, and engaging in fair play towards third parties." Through its first-rate faculty, outstanding lawyering-skills program, and clinical opportunities, Washington University goes a long way toward preparing students for the tensions they will encounter in practice - and training them to respond professionally, but without sacrificing vigor or zeal. It is my hope that the bench and the bar, through example and further training, will reinforce that sense of professionalism, a sense that accrues to the benefit of all.

You may have noticed that although I have already spoken for a while, I have not yet met head-on my granddaughter's central question: "But why?" There is a common frustration in the legal community that all our long hours and hard work are not producing anything socially worthwhile. Indeed, there is an old joke to that effect. It involves two men on a balloon expedition who became hopelessly lost in a storm. When the storm cleared, they found themselves floating above a one-lane road, with nothing in sight but wheat fields. There was no one, absolutely no one, around. Finally, they spotted a woman walking down the road.

[Calling down] "Hey!" they called out. "W-h-e-r-e a-r-e w-e?" To which the woman responded [calling up]: "You're up in a balloon, about twenty-five feet off the ground." "She's a lawyer," one man commented to the other. "How do you know?" companion asked. "Well," he responded, "her answer was clear, precise, perfectly accurate and totally useless."

I think we can all agree that perfect accuracy in the interest of utter futility is not the highest calling of the profession; nor is it, in my opinion, the answer to why lawyers do what they do. In my view, "[b]oth the special privileges incident to membership in [our] profession and the advantage those privileges give [us] in the necessary task of earning a living are means to a goal that transcends the accumulation of wealth. That goal is public service." It is this aspect of professionalism - service to the public - that I want to touch upon last.

Lawyers have in their possession the keys to justice under a rule of law - the keys that open the courtroom door. Those keys are not held for lawyers' own private purposes; they are held in trust for all those who would seek justice, rich and poor alike. We can be proud of the strides the legal community has made toward fulfilling that trust. The bar has never before been involved in greater amounts and more diverse types of pro bono work. Never before have law schools contributed so greatly by providing opportunities for their students to represent and advise those who, but for the students, would have no access to legal advice or legal remedies. My law clerks tell me that those who participate remember their experiences long after they leave the law school;

9

that in practice, they feel both an obligation and a desire to donate a portion of their time and learning to public service.

Yet, despite progress and innovations, a great and crying need for legal services for the poor remains. The most recent estimates suggest that as many as eighty-five percent of the poor's legal needs go unmet. And there is evidence - tragic costly evidence - that a substantial number of citizens believe that equality is but an unrealized slogan; that justice is for "just us" - the powerful, the educated, the privileged. If that perception is to be changed and the factors that created it eliminated, the legal community must dedicate an even greater portion of its time and resources to public service. The ever-increasing pressure on the billable hour, combined with the tremendous emphasis on the bottom line, has made fulfilling the obligation to public service quite difficult. But public service marks the difference between a business and a profession. A business can focus only on profits. A profession cannot. It must focus first on the community it is supposed to serve. And that community needs more legal help now than ever before.

The notion that lawyers have a responsibility to their community, and that they are uniquely capable of making a contribution, is nothing new. Lawyers were a critical group in the building of our own Constitution: at the Convention in 1787, thirty-three of the fifty-five participants were lawyers. And when it proved necessary to drastically revise that document after the Civil War, once again lawyers were the dominant force: at least nine of the fifteen drafters of the Fourteenth Amendment were lawyers. It was lawyers who helped express our society's highest ideals in law then. It is lawyers who now must ensure that those ideals are realized and realizable now - not just for the wealthy, but for the poor, for the disenfranchised, and for the disadvantaged.

I wanted to finish where I started - with my granddaughter. However, she has yet to produce a great quote about professionalism appropriate to this occasion. (Give her time-she's still young). Accordingly, I will close instead with the words of John W. Davis, a former U.S. Solicitor General and (unsuccessful) candidate for president, who reminded the legal community of its sometimes humble but always professional role: "True, we build no bridges," he said.

> We raise no towers. We construct no engines. We paint no pictures. There is little of all that we do which the [human] eye can see. But we smooth out difficulties; we relieve stress; we correct mistakes; we take up other men and women's burdens and by our efforts we make possible the peaceful life of men and women in a peaceful state.

At the Court on which I sit, we do not render advisory opinions. But today, I make an exception and offer one specific piece of advice. As you begin to use this splendid new building, I urge you to focus on the broader moral and ethical implications of your work. You should make it the Law School's commitment to teach the importance of doing good while doing well.